# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>   Plaintiff,<br>   v.<br>ROBERT S. WILLIAMS,<br>   Defendant. | Case No. 5:18-CR -40069-HLT |

## MEMORANDUM AND ORDER

Robert S. Williams is charged with felony drug and firearm crimes. He moves to suppress the evidence found in his vehicle after a traffic stop. Doc. 21. Because the stop was valid at its inception, the officers' use of felony stop procedures was reasonable under the circumstances, and the search was supported by probable cause, there was no violation of Mr. Williams's Fourth Amendment rights and there is no basis to suppress the evidence. Therefore, the Court denies the motion.

## I.  BACKGROUND[1]

Mr. Williams was indicted for violations of 21 U.S.C. § 841(a)(1) (possession with the intent to distribute ecstasy), 18 U.S.C. § 924(c)(1)(A) (possession of a firearm in furtherance of a drug trafficking offense), and 18 U.S.C. § 922(g)(1) (possession of a firearm by a prohibited

---

[1] During the February 21, 2019 hearing on Mr. Williams's motion to suppress, the Court heard testimony from four officers from the Topeka Police Department: Officers Nelson, Qualls, Palumbo, and McEntire; and FBI Task Force Officer Salmon. Based on the officers' calm and cooperative demeanors, forthrightness, and attentiveness during questioning, the Court credits their testimony in its entirety. Although the Court credits the entirety of each witness's testimony, the Court recites only those portions relevant to its resolution of the issues presented by the motion to suppress.

person). These charges stem from evidence discovered during a search of his vehicle, a white GMC Denali, following a traffic stop in Topeka, Kansas, on May 17, 2018.

Five days earlier, on May 12, 2018, a violent homicide was committed with a firearm in Topeka, Kansas. The Topeka Police Department ("TPD") considered Justin McCoy a possible suspect. Mr. McCoy was also known to the FBI from a multi-agency investigation involving houses known to be involved in narcotics trafficking, with a house at 2312 SE Pennsylvania Avenue in Topeka as the hub. Mr. McCoy and his brother were known to frequent that house. FBI agents associated Mr. Williams's vehicle with that house because they had seen it there in April 2018. They first saw his vehicle at a house on SE Indiana Avenue known to be associated with drug trafficking and believed to be connected with the house on SE Pennsylvania. FBI agents observed Mr. Williams enter the house on SE Indiana and come out a short time later with something in his hands. He then drove to the SE Pennsylvania address and entered that house.

On May 17, 2018, FBI Task Force Officer ("TFO") Salmon and FBI Special Agent Ian Knooihuizen were surveilling the Paradise Plaza apartment complex because Mr. McCoy's girlfriend lived there, and he was known to frequent there. Shortly after 9:00 p.m., they saw Mr. Williams's Denali leaving the apartment complex. They radioed the TPD and recommended that officers follow the vehicle because it was a vehicle that could be associated with Mr. McCoy and they knew that TPD considered him a possible homicide suspect.

Shortly thereafter, Officers Barry Nelson and Brady Qualls located the Denali and followed it, watching for a traffic violation. They observed Mr. Williams signal as he began to change lanes and determined that he had committed a traffic infraction by failing to activate his turn signal at least 100 feet prior to starting the maneuver, in violation of K.S.A. § 8-1548.

2

In preparing to make a traffic stop for the violation, Officer Nelson radioed that they were going to execute a "felony car stop." Felony car stops are used when an officer believes that an individual inside the vehicle may attempt to escape or cause potential harm to the officers or the public. In executing a felony car stop or "high-risk car stop," officers do not approach the stopped vehicle but instead remain at their cars in a position of cover, with their weapons drawn, and order the occupants to show their hands, exit the stopped vehicle, and walk toward the officers.

When Officers Nelson and Qualls made the stop, they could see one passenger and believed there was another passenger in the backseat. It was difficult to see because it was nighttime and the windows of the Denali were tinted. The officers exited their vehicle and took positions behind the front doors, with their guns drawn. Additional patrol cars arrived as backup. Officer Nelson ordered the driver (Mr. Williams), to put his hands out of the window, exit the car, and walk back to where the officers were standing. Officer Nelson saw that the left front pocket of his shorts was "turned out" as if something had been hurriedly taken out of it. Officer Qualls handcuffed Mr. Williams, noticing the smell of raw marijuana on him. He placed Mr. Williams in the backseat of a patrol car. Officer Nelson then ordered the passenger, Tara Wharton,[2] to exit and walk back toward him. An officer handcuffed Ms. Wharton and placed her in the backseat of a different patrol car. Officer Nelson called out for any other passengers to exit. When no one responded, several officers approached the Denali, with their weapons drawn and in the "low ready" position, to verify that there were no other passengers in the vehicle. They did not find any other passengers.

While standing outside the driver's door of the Denali, Officer Anthony Palumbo shined his flashlight into the vehicle and saw a knife on the front seat. A short time later, he saw a jar under the seat and announced to Officer McEntire, who was outside the passenger door, that there

---

[2] At the time of these events, Ms. Wharton was engaged to Mr. Williams. They have since married, but the Court will refer to her as Ms. Wharton, as was done at the hearing.

was dope in it. When he removed the jar, he saw that it contained marijuana and pills that were ultimately determined to be Ecstasy. Back at the patrol cars, Ms. Wharton told an officer that she had marijuana in her pants that Mr. Williams told her to hide when they were stopped. When an officer told her that a safe had been found in the Denali, she said that there were two guns in the safe and that both belonged to her. Ms. Wharton identified which of her keys would unlock the safe. When officers opened the safe, they found one gun, ammunition, and cash. Ms. Wharton stated that her other gun was at her house. Officers also found a digital scale and cocaine in the Denali.

Mr. Williams brings this motion to suppress all of the evidence found in the search, as well as any statements made or evidence gathered, during his allegedly illegal detention.

## II. ANALYSIS

Mr. Williams advances four arguments. First, he argues that law enforcement violated his Fourth Amendment rights because the traffic stop was not justified at its inception. Second, he contends that even if the stop was justified, the officers' use of felony stop procedures converted the traffic stop into an arrest that was not supported by probable cause. Third, he argues that officers lacked probable cause to search the vehicle. Doc. 21 at 12. Fourth, and finally, he argues that Ms. Wharton's consent for the search of the safe found in the vehicle was not voluntary—and thus, not effective—and therefore, the handgun and other contents must be suppressed. *Id.* at 14. For the reasons stated below, the Court rejects each of these claims.

**A. The Initial Stop Was Valid.**

It is settled law that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a

traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (quoting *Delaware v. Prouse,* 440 U.S. 648, 661 (1979)).

Here, Officers Nelson and Qualls observed Mr. Williams make a lane change without signaling at least 100 feet before the move, in violation of K.S.A. § 8-1548. That statute states in relevant part:

> (a) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety, nor without giving an appropriate signal in the manner hereinafter provided.
>
> (b) A signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning.

K.S.A. § 8-1548.[3]

The Court finds that Mr. Williams violated this statute by moving from the left lane to the right lane without activating his turn signal at least 100 feet before the move, based on Officer Nelson's testimony and the video of the stop admitted into evidence. Because the officers observed a traffic violation, the Court finds that the initial stop was valid.

**B. The Use of Force in Executing the Stop Did Not Render the Stop an Unlawful Arrest.**

Mr. Williams argues that, even if the stop was valid at its inception, it became a de facto arrest, unsupported by probable cause, when officers used felony stop procedures. Doc. 21 at 7.[4]

---

[3] Mr. Williams argues that he did not commit a violation because the section "should not" apply to lane changes. Doc. 21 at 6. The Court rejects this argument because the Kansas Supreme Court has interpreted K.S.A. § 8-1548 as applying to both turns and lane changes, *State v. DeMarco*, 952 P.2d 1276, 1281 (Kan. 1998), and federal courts are bound by the interpretation of state statutes pronounced by the highest court of the state—here, the Kansas Supreme Court. *See*, *e.g.*, *United States v. Benton*, 876 F.3d 1260, 1263 n.1 (10th Cir. 2017). For this reason, the Court does not consider the cases Mr. Williams cites from the Kansas Court of Appeals.

[4] Mr. Williams's reliance on *United States v. Moran*, 503 F.3d 1135 (10th Cir. 2007), is misplaced because *Moran* considered only the propriety of the stop at its inception. *See United States v. Windom*, 863 F.3d 1322, 1332 (10th

He argues that a felony stop was not warranted for a minor traffic violation and that it cannot be justified based on Mr. McCoy's possible presence because the information that law enforcement had to associate his vehicle with Mr. McCoy was merely speculative. *Id.* The government responds that the officers' use of felony stop procedures was justified because the procedures were reasonably necessary for officer safety and to maintain the status quo. The Court agrees.

Use of guns by law enforcement during a *Terry* stop will typically escalate the seizure into an arrest, which requires probable cause to be lawful. *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). However, "the use of guns in connection with a stop is permissible where the police reasonably believe that the weapons are necessary for their protection" and such use does not convert a *Terry* stop into an arrest. *Id.* at 1462 (citation and quotation omitted). Officers may use forceful techniques without converting a *Terry* stop into a custodial arrest if the techniques were "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Mosley*, 743 F.3d 1317, 1329 (10th Cir. 2014). In evaluating the reasonableness of an officer's use of force, courts apply an objective standard, asking whether "the facts available to the officer <u>at the moment</u> of the seizure or the search would warrant a man of reasonable caution in the belief that the action taken was appropriate." *United States v. Windom*, 863 F.3d 1322, 1328 (10th Cir. 2017) (emphasis added) (citations and quotation omitted).

Here, the facts known to the TPD officers making the stop justify their conduct. The TPD was investigating a violent homicide committed five days earlier with a handgun. On the morning of the stop, Agent Knooihuizen briefed Topeka police officers, including Officer Qualls, about an

---

Cir. 2017) (finding *Moran* inapposite to case where stop was justified at its inception and only issue was force used during the ensuing detention).

ongoing, multi-agency investigation of drug trafficking and crimes allegedly committed by Mr. McCoy and his brother while based out of a house on SE Pennsylvania Avenue. The FBI knew that weapons were "going in and out of" that house "frequently." Mr. Williams had been seen entering the SE Pennsylvania house after leaving a house on SE Indiana Avenue—another house known for drug trafficking—with something in his hands. TFO Salmon explained that because the houses were associated with trafficking, only persons known to or in association with the occupants—the McCoy brothers—would have been allowed to enter. For this reason, the FBI believed that Mr. Williams was working with Mr. McCoy.

On the night of the stop, TFO Salmon and Agent Knooihuizen were surveilling the Paradise Plaza apartment complex where Mr. McCoy's girlfriend lived and he was known to frequent. They saw the Denali but could not see inside it because it was dark outside, and the windows were tinted. TFO Salmon alerted TPD officers over the radio that it would be a good vehicle to follow to attempt to locate Mr. McCoy. There was an "understanding that a stop of this magnitude" would result in a felony car stop, which is used, inter alia, when officers believe that an individual in the vehicle has the potential to cause harm to the public or the officers.

Officer Nelson and Officer Qualls located the Denali and followed it until it they observed a traffic violation on a busy street with civilian traffic. The Court finds that they had sufficient knowledge to reasonably believe that felony stop procedures were necessary for their safety and for the safety of other motorists and pedestrians. Federal investigators had informed officers that Mr. McCoy was "known to ride around in" the Denali and told Officer Qualls and others at a briefing that "Mr. Williams was somebody that [Mr. McCoy] had possibly been staying with recently." The officers also knew that Mr. McCoy was a possible suspect in the recent, violent

homicide that involved the use of a firearm.[5] When Officers Nelson and Qualls pulled the vehicle over, they thought they saw a third person in the vehicle, who could have been Mr. McCoy.

The fact that Mr. McCoy was not in the vehicle is not relevant to the question before the Court. The Court must not rely on "the 20/20 vision of hindsight." *Mosley*, 743 F.3d at 1328.[6] TFO Salmon testified that concern for officer safety is heightened when making contact with individuals sought in connection with a violent crime where firearms are used. The Court finds that under the totality of the circumstances, the facts known to the officers at the time they initiated the stop were sufficient to support a belief that the use of force was reasonably necessary to assure officer safety. The Court concludes that the officers' use of handguns and handcuffs was justified under the circumstances and did not convert the valid traffic stop into an unlawful arrest.[7]

### C. The Search of the Vehicle Was Supported by Probable Cause.

Law enforcement may search an automobile during a traffic stop without a warrant if probable cause exists to believe that contraband or evidence of criminal activity is located inside. *United States v. Snyder*, 793 F.3d 1241, 1244 (10th Cir. 2015). Here, the government advances two bases for probable cause: plain smell and plain view. The Court finds that both bases are valid.

---

[5] Given these facts, the Court rejects Mr. Williams's reliance on *State v. Carr*, 406 P.3d 403, 412 (Kan. App. 2017), *rev. denied* (Kan. 2018), because it finds that the information known to the officers here was greater than that which was found insufficient in *Carr*. Likewise, the Court is unpersuaded that *United States v. Jones*, 998 F.2d 883, 886 (10th Cir. 1993), demands a different result here. Finally, the Court rejects Mr. Williams's reliance on *United States v. Melendez-Garcia*, 28 F.3d 1046 (10th Cir. 1994). Doc. 21 at 9. That case is distinguishable because there the court based its ruling on the absence of evidence or testimony from the police that they had reason to believe that the suspects had guns or were violent or knew of circumstances warranting the handcuffing of defendants during a *Terry* stop. Rather, the facts of this case and analysis are more similar to those in *United States v. Merritt*, 695 F.2d 1263 (10th Cir. 1982), and *Perdue*, 8 F.3d at 1461–63.

[6] *See also United States v. Perea*, 374 F. Supp. 2d 961 (D.N.M. 2005) (stating that, although officers' belief that a homicide suspect was in the vehicle was mistaken, felony stop was justified; rejecting defendant's position that officers should have treated the stop as an ordinary traffic stop).

[7] During the evidentiary hearing, Mr. Williams adduced facts surrounding law enforcement's encounter with Mr. McCoy later that evening. The Court finds that these facts are not relevant to the questions before this Court—they happened after the traffic stop, and the questions in this case concern the stop itself.

### 1. The smell of marijuana on Mr. Williams's person gave probable cause to search the car.

The government's first basis for probable cause is the smell of marijuana emanating from Mr. Williams's person. This basis for probable cause has been recognized by the Tenth Circuit. *United States v. Johnson*, 630 F.3d 970, 973-74 (10th Cir. 2010) (finding probable cause for a vehicle search where a trooper detected the smell of marijuana coming from the defendant's person). But Mr. Williams argues that the smell cannot be used to establish probable cause here because he was handcuffed and under unlawful arrest at the time the smell was detected. Doc. 21 at 12.[8] No one disputes that Officer Qualls handcuffed Mr. Williams almost immediately when Mr. Williams approached after being ordered out of the vehicle. Officer Qualls testified that he smelled raw marijuana on Mr. Williams as he handcuffed him, and the Court finds that Mr. Williams was not handcuffed before the smell was detected. Moreover, the Court finds that the use of guns and handcuffs in executing the felony stop was reasonable under the circumstances and did not convert the *Terry* stop into an arrest. *Perdue*, 8 F.3d at 1463 (citing *United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993) ("[B]ecause safety may require the police to freeze temporarily a potentially dangerous situation, both the display of firearms and the use of handcuffs may be part of a reasonable *Terry* stop.")).

---

[8] Mr. Williams also argues that the scope of the stop was unlawfully expanded beyond what was necessary to issue a citation for the traffic infraction, citing *Botero-Ospina*, 71 F.3d at 786. But the Tenth Circuit explicitly rejected a defendant's reliance on *Botero-Ospina* in a case similar to the instant case, where an officer smelled burnt marijuana emanating from the car. *United States v. Snyder*, 793 F.3d 1241, 1244 n.1 (10th Cir. 2015). The court stated, "our cases allow an expanded stop where . . . the officer develops probable cause to believe the passenger compartment contains contraband." *Id.* The court held that the smell of burnt marijuana emanating from the car gave the officers probable cause. *Id.*

### 2. The marijuana contained in the jar was in plain view.

The government alternatively relies on the plain-view doctrine to establish probable cause to search the vehicle. The plain-view doctrine states that an officer may seize evidence without a warrant if:

>  (1) the officer was lawfully in a position from which to view the object seized in plain view;
>
>  (2) the object's incriminating character was immediately apparent—i.e., that the officer had probable cause to believe the object was contraband or evidence of a crime; and
>
>  (3) the officer had a lawful right of access to the object itself.

*United States v. Carey*, 172 F.3d 1268, 1272 (10th Cir. 1999) (citation and quotation omitted); *see Horton v. California*, 496 U.S. 128, 136 (1990).

Mr. Williams contends that the officer was not lawfully in a position to view the jar and that it was not in plain view. However, he offered no evidence or testimony on that point. In contrast, Officer Palumbo testified that, from where he was standing outside the open driver's door of the vehicle and without crossing the plane of the door opening, he saw marijuana in a jar that was protruding from under the driver's seat. Bodycam video shows that Officer Palumbo identified that there was "dope" in a Mason jar while he was standing outside the vehicle, before he took the jar out from under the seat. The Court concludes that the marijuana in the jar was in plain view and that the officer was in a lawful position to see it. This is an alternative basis for probable cause to search the vehicle.

### D. The Search of the Safe Was Supported by Probable Cause and Consent

Lastly, the Court finds that the government has met its burden to show that the search of the safe did not violate the Fourth Amendment. The government had probable cause to search the

vehicle for narcotics, which extended to the safe.[9] Regardless, the government has also shown that the consent to search the safe was given freely and voluntarily, without duress or coercion, express or implied. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973). In determining the voluntariness of consent, courts must consider the totality of the circumstances around the consent, including factors such as:

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

*United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012) (quotation and citation omitted). The only factors weighing against voluntariness are that five or more officers were present, officers displayed their weapons during the initial stop, and Ms. Wharton was handcuffed in the back of a patrol car at the time she gave consent. But the testimony of officers and the bodycam video of officers' interactions with Ms. Wharton show that the interactions were calm and none of the officers used an angry or aggressive tone. The testimony and bodycam video further show that officers did not use violence or threats, physically mistreat Ms. Wharton, or in any way attempt to deceive, trick, or otherwise induce her to gain consent. There is no evidence that she was under any physical or mental disability at the time she gave consent. Weighing the facts, the Court

---

[9] The officers had probable cause to search the vehicle for narcotics, which extended to the safe because it was a container of a size and shape to hold contraband. An officer testified that it is unusual to find a safe in a vehicle and he would expect it to contain contraband. Moreover, the officers knew that Mr. Williams smelled of marijuana and was associated with houses where drug and gun trafficking was occurring. *See United States v. Ross*, 456 U.S. 798, 823-24 (1982) (holding that officers "who have probable cause to believe that contraband is concealed somewhere within [a vehicle] may conduct a probing search of compartments and containers within the vehicle"). Thus, this Court addresses voluntariness only for purposes of completeness. The Court also acknowledges the government's argument that Mr. Williams lacks "standing" to challenge the voluntariness of the consent but does not address it because the Court resolves the issue on the merits.

concludes that Ms. Wharton's consent was freely and voluntarily given and not the product of duress or coercion. Further, the search of the safe was supported by probable cause.

## III. CONCLUSION

The stop of Mr. Williams's vehicle was valid because it was based on an observed traffic violation. The officers' use of felony stop procedures, including guns and handcuffs, was reasonable under the circumstances known to the officers at the time of the stop. The search of the vehicle was based on probable cause derived from the smell of marijuana on Mr. Williams's person and the sight of marijuana in plain view in the vehicle. Probable cause supported the search of the safe, and Ms. Wharton voluntarily consented to the search of the safe.

THE COURT THEREFORE ORDERS THAT Mr. Williams's Motion to Suppress (Doc. 21) is DENIED.

IT IS SO ORDERED.

DATED:  March 18, 2019 /s/ *Holly L. Teeter*
HOLLY L. TEETER
UNITED STATES DISTRICT JUDGE